**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **JOHNNIE MAE SAWYER, as** ) | |
| **Daughter and Administrator of the Estate of** ) | |
| **ARTHUR WATERS, deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO. 2:12-0020-KD-M** |
| ) | |
| **SYLVIA COLLINS, BOBBY SANDERS,** ) | |
| **and JAMES HOOD,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

This action is before the Court on the Motion for Summary Judgment filed by defendants Sylvia Collins, Bobby Sanders and James Hood, defendants' Motion to Exclude Causation Testimony, and documents in support (Docs. 143-149); plaintiff Johnnie Mae Sawyer's response in opposition and documents in support (Docs. 159-161), and defendants' reply (Doc. 162). Upon consideration, and for the reasons set forth herein, the Motion for Summary Judgment is GRANTED, in part, and the Motion to Exclude is DENIED.

I. Claims

On January 20, 2012, plaintiff Johnnie Mae Sawyer, the daughter of Arthur Waters, deceased, filed a Complaint pursuant to 42 U.S.C. § 1983 against defendants Sylvia Collins and Bobby Sanders, both jailers at the Perry County Jail, and against defendant Perry County Sheriff James Hood. (Doc. 1) Sawyer alleged that defendants violated Waters' constitutional right under the Eighth Amendment to be free from cruel and unusual punishment when they were deliberately indifferent to his serious medical needs and failed to provide medical treatment which resulted in Waters' death while an inmate in the Perry County Jail.

On July 17, 2012, Sawyer filed her First Amended Complaint alleging Count One pursuant to 42 U.S.C. § 1983 against defendants Collins, Sanders, and Hood in their individual capacity, for violation of Waters' constitutional rights under the Eighth Amendment resulting in his death and Count Two against Collins and Sanders, in their individual capacity, for common law negligence for delaying and denying Waters' medical treatment resulting in his death. (Doc. 37, ¶¶ 27-30; 32-35)[1] Sawyer seeks a judgment against all defendants for punitive damages pursuant to Ala. Code § 6-5-410 in an amount to be determined by a jury, court and litigation costs, including attorney's fees pursuant to 42 U.S.C. § 1988, and other relief. (*Id.*, ¶¶ 30, 35)

II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

---

[1]Paragraph 17 of the First Amended Complaint was later amended to allege that Waters

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). As the Eleventh Circuit has articulated, however,

> The nature of this responsibility varies . . . depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.
>
> . . . *Celotex* requires that for issues on which the movant would bear the burden of proof at trial,
>
>> that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.
>
> [*United States v.]Four Parcels[of Real Property*], 941 F.2d [1428,]1438[ (11th Cir. 1991)] (citations and internal quotation marks omitted; emphasis in original).
>
> For issues, however, on which the non-movant would bear the burden of proof at trial,
>
>> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]-

that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels*, 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. *Coats & Clark*, 929 F.2d at 608. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is, such that no reasonable jury could find for the non-movant-should the movant be permitted to prevail without a full trial on the issues. *Anderson[v. Liberty Lobby, Inc.],* 477 U.S. [242,] 249-50, 106 S. Ct. [2505,] 2511[ (1986)].

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S. Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Melissa L. Nelkin, <u>One Step Forward, Two Steps Back: Summary Judgment After *Celotex*</u>, 40 Hastings L.J. 53, 82-83 (1988).

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (headings and footnotes omitted).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

III. Facts[2]

Plaintiff Johnnie Mae Sawyer is the daughter of Arthur Waters and "the personal representative of his Estate. Waters died while an inmate of the State of Alabama in Perry County Jail. (Doc. 37) Waters was convicted of second degree assault and the Circuit Court ordered Waters to surrender to the Perry County Jail no later than five o'clock p.m. on June 20,

---

[2] The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [the plaintiff] the nonmoving party." *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). Moreover, on summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). *See also, e.g., Sharpe v. Global Sec. Int'l*, 766 F. Supp. 2d 1272, 1282 (S.D. Ala. 2011) (Steele, C.J.) ("[T]he Court . . . will not independently examine uncited portions of the record in search of support for a particular proposition[ on summary judgment]." (citing cases)).

2011. (*Id*.)  He surrendered at about two o'clock p.m.  (*Id*.)  Waters was a fifty three year old man who was five foot, seven inches tall and weighed 121 pounds (Doc. 37, at ¶ 8).

On June 20, 2011, Sawyer was with Waters until about 12:30 p.m. Sawyer did not observe Waters drink any alcohol during this time. (Doc. 159-6, Sawyer depo., p. 2)  Waters did cough, sneeze, sniffle and complain that he was short of breath, could hardly breathe, and that his back hurt.  Sawyer wanted to take Waters to a doctor, but Waters refused and told her that Sheriff Hood had told him to report to the Jail by two o'clock. (*Id*., p. 2-3)  At 11:00 a.m., they went across the street from Sawyer's house and sat under an oak tree while Waters drank juice. (*Id*., p. 3)  Waters left at about 12:30. (*Id*.)

Tomeka White was with Waters when he reported to the jail. She did not see Waters buy or consume alcohol.  He did not appear to have been drinking or to be under the influence, and in her opinion, he was not drunk when he reported. (Doc. 148-13)  Waters was dropped off at the jail by his son-in-law. (Doc. 37)

Defendant Sheriff Hood and Jailers Sylvia Collins and Bobby Sanders were at the Jail when Waters arrived around 2:00 p.m. on June 20, 2011.  Collins and Sanders worked the 8:00 a.m. until 4:00 p.m. shift that day. Collins testified that she did not see Waters when he arrived at the jail and that she did not have any contact with him that day. (Doc. 148-4, Collins depo., p. 7-8)[3]  As to her usual work day, Collins testified as follows: "I come in in the morning, do the observation, I walk around the cells, look in the cells, and I go back in and do the observation sheet, our fire log, each hour, I do that, and just mostly monitor them on the monitor." (Doc. 159-4, p. 2)

---

[3] Sawyer asserts that the Fire Watch Log Sheet for June 20, 2011, indicates that Sanders and Collins listed "All Dept. Secured" on each hour. (Doc. 159-27)  From this, Sawyer asserts that Collins' "fire watch log states she did" have contact with Waters. (Doc. 160-1, p. 21)

Sanders saw Waters on the monitor when he came in the front door and went up front to meet him.  (Doc. 148-3, Sanders depo., p. 37)  Hood was "coming up the hall" when Waters reported and he and Sanders "smelled alcohol" on Waters. (Doc. 148-1, Hood depo., p. 10) Hood asked Waters: "Why you reported to jail under the influence of alcohol", to which Waters replied: "Well, I'm going to be gone for a while, so I just tied me one on." (*Id.*, p. 10-11)  Hood did not observe any symptoms of alcohol withdrawal.  (*Id.*, p. 10)[4]

At 2:15 p.m., Sanders began the Booking Sheet. (Doc. 159-26)   To complete the first page of the Booking Sheet the Booking Officer must mark a list of "Visual Observations" (Doc. 159-26, p. 2).  Sanders marked "Yes" to whether Waters appeared "under the influence of alcohol or drugs" and whether there were "visible signs of alcohol or drug withdrawal such as extreme sweating, shakes, nausea, pinpoint pupils, or cramping." (*Id.*)

Sanders marked "No" as to other questions regarding any visual observations of "obvious pain, trauma, bleeding, or other symptoms suggesting a need for medication attention", "fever, swollen lymph nodes, jaundice or other evidence of infection", and whether Waters' brought any medications with him to the Jail.[5] (*Id.*)  Sanders noted:  "The Inmate are (*sic*) under the influence of alcohol drunk." (*Id.*)

Page 2 of the Booking Sheet is a Health Screening Form. (Doc. 159-26, p. 2)  The Form was left blank.  On Page 3, Sanders wrote: "The inmate refused or was unable to cooperate and refuses to answer my questions concerning medical history and/or potential for suicide." (*Id.*, p. 3)  As to the "Reason for inability", Sanders noted "The Inmate are (*sic*) Drunk" (*Id.*).  The Sheet

---

[4]   Sanders testified that Hood asked Waters if he had been drinking.  Waters answered that he had "a couple of beers" and that he was "going to be locked up for while" and "might as well just got mine on." (*sic*) (*Id.* p. 37-38)
[5] There are other questions regarding risk of assault, physical handicaps, depression, despondency, "obvious scars from previous suicide attempts" that are not relevant in this action.

requires a certification that the officer observed the inmate, questioned the inmate, and "accurately recorded" the observation and responses. Sanders signed the certification at 2:20 p.m. (*Id.*)

Sanders later testified that he was mistaken when he marked that Waters was showing symptoms of alcohol withdrawal. At the time he completed the Booking Sheet, Sanders did not believe that Waters was in alcohol withdrawal but rather intoxicated. (Doc. 148-3, p. 15-16) Based on Hood and Sanders' opinion that Waters was intoxicated, around 2:30 p.m. Sanders placed Waters in an intake cell where intoxicated inmates are housed before placing them in general population. (Doc. 145, p. 14)[6]

Jail Trustee William Tutt talked with Waters when he arrived. Waters told Tutt that "his back was hurting and he wasn't feeling too good." (Doc. 148-11, Tutt depo., p. 2) Tutt brought Waters a drink from the drink machine and took it to him in the intake cell. (*Id.*, p. 3) Tutt heard Waters ask about going into general population and heard Hood tell Waters that he could not because he had been drinking. Waters stated that he had "one or two beers" and denied being drunk. (*Id.*, p. 3-4)

Later, around 2:30 to 2:40 p.m.,Tutt took Waters his food tray but Waters "said that he didn't feel like eating because he didn't feel good." (*Id.*, p. 4)[7] Tutt left the food tray "on the flap" and when he returned to get the tray about fifteen minutes later, Waters had not eaten. (*Id.*) Waters asked Tutt to tell the jailers to "let him go to the back (general population) because his

_____

[6] The Toxicological Analysis Report found that Waters' blood was negative for "Ethanol" *i.e.*, alcohol. (Doc. 148-21, p. 7-8)

[7] Collins testified that she opened the trap doors so that the inmates could be given their meals "because we keep them closed at all times, so we go back and forth and open those[.]" (Doc. 159-4, p. 2) From this testimony, Sawyer asserts that Collins must have been with Tutt when he brought Waters his lunch, and thus "it could be inferred that Collins and Sanders also heard Waters was not feeling well." (Doc. 160-1, p. 25) However, Tutt testified that "nobody" was there when he took Waters his sandwich at lunch on June 20. (Doc. 159-7, p. 41)

back was hurting and that concrete up there, he said was hurting his back and stuff." (*Id.*, p. 6) Tutt told Sanders what Waters had said. (*Id.*, p. 7)

Tutt spoke with Waters again around 3:45 p.m. He asked Waters if he felt better but Waters "said no, his back was still hurting and he still wanted to go back in the back to population." (*Id.*, p. 7) Tutt told Sanders again that Waters "was still complaining, that he wanted to go in the back, that his back was hurting." (*Id.*, p. 7-8) Tutt returned to his cell around 4:00 p.m. (*Id.*, p. 8)

Collins testified that there were no monitors in the intake cell. To monitor the inmates, the jailer had to go to the cell and look in. Collins testified that she did not go to Waters' cell but "Bobby Sanders did." (Doc. 159-4, p. 3-4).

At 4:00 p.m., Collins and Sanders left and Jailers Mary Bennett and George Lewis began their shift. (Doc. 148-20, Bennett depo., p. 3) Bennett and Lewis worked from 4:00 p.m. until midnight and they checked on Waters approximately every hour until their shift ended. (*Id.*, p. 5) Bennett stated that Waters "was fine" and "didn't complain about nothing, he just laid there the whole time." (*Id.* p. 4)

At midnight, Jailer Maggie Hinkle started her shift and worked until 8:00 a.m. (Doc. 148-7, p. 5) She checked on Waters. He slept through the night and was asleep when she left at 8:00 a.m. (*Id.*)

On June 21, 2011, around 5:30 a.m., Tutt was going to the laundry room near intake and heard Waters moan. (Doc. 148-11, p. 10) He looked in the cell and saw Waters was "shaking and bursted out with sweat and barely gasping for air." (*Id.*) He asked Waters what was wrong and Waters responded that he was cold. Tutt then "went and got him another blanket and gave it

to him." (*Id.*)  Tutt stated that the "cell wasn't opened" and that he slid the blanket through the hole in the door. (*Id.*, p. 11)

Tutt did not tell Jailer Hinkle "because she can't move nobody till the next shift, till the 8 o'clock shift." (*Id.*)  Tutt checked on Waters again around 5:45 a.m. when he took the breakfast tray but Waters said that he did not feel like eating.  Tutt picked up the tray around 6:00 a.m. and Waters had not eaten anything. (*Id.* p. 12)  Tutt did not tell Jailer Hinkle about Waters' condition. (*Id.*)  Tutt looked in on Waters again between 7:00 and 7:45 a.m. and Waters was "still busting out with sweat and shaking." (*Id.*)

At 8:00 a.m., Collins and Sanders arrived for their shift.  Tutt did not have any conversations with Collins that morning except to speak when she first arrived. (*Id.*, p. 19-20) When Sanders and Tutt were taking out the trash about 8:00 a.m., Tutt told Sanders that Waters was "humped over and gasping for air[8] and sweating and that he said he don't feel good", "barely breathing like he's weak", "complaining that his back was hurting" and "he wanted to be back in the back." (Doc. 148-11, p. 16-17)  Sanders told Tutt that he would take Waters to the back after he took another inmate to the doctor. (*Id.*, p. 17)  Sanders did not recall anyone from the midnight shift telling him anything about Waters when Sanders arrived on the morning of June 21. (Doc. 148-3, p. 33)

Shawanda Anderson was an intake clerk at the jail. (Doc. 148-15, p. 10)  Her desk was approximately twenty to twenty-five feet from the intake cell where Waters was placed. (*Id.*, p. 2)  On the morning of June 21, she arrived at work around 8:00 a.m. (*Id.*, p. 4)  She did not see Collins in the intake area before 11:00 a.m. and could not recall seeing Collins in intake that day.

---

[8] At deposition, Tutt was questioned regarding whether he saw Waters "gasping for air" or "short of breath." (Doc. 148-11, p. 36-38) Tutt appeared to equate the two: "Q. Okay.  Then when did he first start gasping for air? A. Five thirty he was like he was short of breath and shaking and humped up." (*Id.* p. 36)

(*Id*. p. 3).  She saw Sanders when he came in between 8:00 and 8:30 a.m. and saw him again "a little before eleven when he was coming to move Waters to the back." (*Id*.)

Anderson talked to Waters while he was in the intake cell but could only see his face. (Doc. 159-16, p. 2)  She spoke with Waters at about 8:00 a.m. when she came to work. (Doc. 148-15, p. 4).  She asked him "how he was doing" and he told her "he was okay except he was thinking about him going back to prison." (*Id*.)  Anderson spoke with Waters again about forty-five minutes later because she had left "in the middle" of their earlier conversation. (*Id*., p. 6)  She asked again "was he okay . . . because we had just had a conversation of him being depressed about going back to prison[.]" (*Id*.) Waters responded that he was okay but he just wanted to be around somebody and wanted to go to the back. (*Id*.)

When Sanders returned around 11:00 from taking another inmate to the doctor, Tutt told him again about Waters.  (Doc. 148-11, p. 19; Doc. 159-3, p. 5)  Tutt estimated that he and Sanders moved Waters to the back around 11:30 to 11:45 a.m. (Doc. 148-11, p. 20) Tutt carried Waters' mattress because he was too weak. (*Id., p.* 32)  Waters "was complaining that his back still hurt him real bad and like he was short of breath." (*Id*.)  As they were walking to the back, Tutt heard Waters say that "he didn't feel good, that he needed to see a doctor." (*Id*.)  Tutt believed that Waters' condition was serious "[a]fter he had to help him down the hallway with his mat" because "he was slumped over, barely walking like he couldn't catch his breath or something." (Doc. 159-7, p. 12)

Collins did not notice whether Waters looked fatigued or notice anything unusual about the way he walked because she "didn't look at him that close." (Doc. 148-4, p. 9) She was in the control room and "could see him coming out of intake[.]" (Doc. 159-4, p. 4)  Collins did not

come out of the control room. (*Id*.) Collins saw Waters walking with Tutt and Sanders and Tutt was carrying Waters mattress. (*Id*.)

Sanders did not think that Waters was having trouble walking back to general population. (Doc. 148-3, p. 30)  Waters asked Sanders to "hurry up" and get him out because "it's cold in here" and his back hurt "because you know that ain't nothing but a slab of concrete up there I was sleeping on." (*Id.,* p. 29-30).  When questioned whether Waters had "no trouble breathing, no fever, sweating, shakes, chills" when moved, Sanders answered "no". (*Id.*, p. 31)

Sanders did not see Hood when they were walking back but thought that if Hood was around Waters, "it had to be while [Hood] was coming to intake or going back down the hall when I was taking [Waters]." (Doc. 148-3, p. 30-31)  Hood was not sure but thought he might have seen Waters when Sanders and Tutt were moving him.  He could not recall whether Waters was carrying his mattress and sheets. (Doc. 148-1, p. 12-13).  Hood did not think he said anything to Waters. (*Id*., p. 13)

 Anderson saw Sanders, Tutt and Waters when Waters was moved to general population. (Doc. 148-15, p. 5)  When Waters was leaving the intake cell, Anderson also saw Hood "coming down the hallway." (*Id*., p. 8)  She could not "recall what was said" but thought Hood should have seen Waters.   She stated that Waters was walking slow and holding his back. (*Id*.) She did not hear Sanders or Tutt make any statements. (*Id*.)  She saw Tutt "lift the mattress" for Waters to take to general population and when they were "going down the hallway" she heard Waters say "that his back was bothering him from sleeping on the hard bunk in intake." (*Id*., p. 5)  She reiterated that Waters "was walking out of intake and he was like, 'Thank you, Bob, because my back hurting from sleeping on that hard bunk in intake.'" (*Id*., p. 7)  She did not see or talk with Waters again. (*Id*., p. 8)

Inmate Lamar Williams was in a cell in general population and saw Waters coming down the hall. He thought Waters "seemed very weak and seemed like he was out of breath." (Doc. 159-15, p. 2) Williams testified that Waters "could barely hold himself up" and that when Sanders stopped to open the door, Waters "put a hand on the wall" and Williams saw "him taking deep breaths." (*Id*.) Williams described Waters' walk to the cell as "barely making it." (*Id*.) Williams believed that Waters was weak and that "something was wrong." (*Id*.)

Sanders and Tutt put Waters in the cell with his mattress and Waters "was still hollering back that he was sick and stuff." (Doc. 148-11, Tutt depo., p. 21) Tutt thinks that Collins opened the cell for them. (*Id., p.* 28-29) Waters told Sanders that his back hurt and asked: "would you give me something." (Doc. 148-3, Sanders depo., p. 32) At 11:15 a.m., Sanders gave Waters two Ibuprofen and water, and Waters lay down. (*Id*.; Doc. 159-25, Medication log) Sanders testified that Waters never asked him to see a doctor, he "just asked [him] for something for pain." (*Id*., p. 35) After Sanders gave Waters the Ibuprofen, he saw him lying down for about thirty to forty minutes. (Doc. 148-3, p. 34)

When Waters went into the cell, Williams was in the cell across the hall and saw Waters "drop[] down on the mat" but a "few minutes later, he got up and hit the button" on the intercom. (Doc. 159-15, p. 3) Williams could not hear Waters' conversation over the "mic", but he talked and then "dropped back down on the mat." (*Id.*) Williams heard Waters' cell mate Oliver Kynard come to the window and say: "they need to get this man out of here because he's sick." (*Id*.) Williams then saw Kynard go to the button and speak to the jailers. (*Id*.)

When Tutt returned with lunch around 12:00, Waters was lying on the floor. Waters told Tutt that he didn't want his lunch and was "hollering out through his hole" in the cell door that he was sick and needed to see a doctor. (Doc. 148-11, p. 22, 29) Around 2:00 p.m., Sanders saw

Waters "sitting on the stool looking at the TV" but then Sanders left to go to Tuscaloosa around 3:00 p.m. (Doc. 148-3, p. 34-35).

Williams testified that Waters lay down for about two hours and woke up. (Doc. 159-15, Williams depo., p. 5) At that time, Kynard told Williams that Waters had "used the restroom on hisself." (*sic*) (*Id.*, p.3) Williams heard Kynard at the button telling the jailers that they "needed to take [Waters] to the hospital" (*Id*. p. 4) Kynard "hit the button again and Ms. Collins came over to the door" and she "kept saying" she would tell Hood. (*Id.*, p. 4) Williams saw Kynard beat on the window and he estimated that between Kynard and Waters, they were "at that button about six to eight times" before 4:00 p.m. (*Id.*) Williams testified that when Waters tried to rise from the mattress, he fumbled for a few minutes and "was all up against the wall trying to get up." (*Id.*)

Kynard testified that he was the only one in the cell when Waters arrived with Tutt and Sanders. (Doc. 159-8, p. 1) Waters, in the presence of Tutt and Sanders, told Kynard that that he was sick, needed to go to a hospital, and needed help. (*Id.)*Kynard saw Waters take the Ibuprofen from Sanders right after Waters came to the cell and Kynard thought Sanders brought another dose about an hour later. *(Id*., p. 5-6) Kynard could not recall how many times Sanders came back to the cell but knew that he had "come out and said something" because Kynard kept ringing the bell and beating the windows. (*Id.*, p. 6)

Kynard described Waters' symptoms when he first came into the cell as moaning and groaning and complaining that he could not "take a deep breath" and "hurting bad and breathing bad." (*Id.,* p. 4) He also said that Waters was "hurting when he was breathing", "the mid upper part of this back was hurting", he was "sick and in pain, serious pain" and "dragging around."

(*Id.*, p. 2-4) Kynard saw that Waters did not eat his lunch when it was served between 11:00 and 12:00. (*Id.,* p. 9)

Soon after Waters first came in, Kynard rang the bell and guessed that it was Collins who answered. Kynard recalled that Waters had already removed his clothes when Kynard called Collins the first time. (*Id.*, p. 1-2) Kynard told Collins that Waters needed to go to the hospital because he was sick. (*Id.*) A "little while after" Waters had taken Ibuprofen, Collins came to the cell door. (*Id.*, p. 6-7) Kynard told her that Waters needed to go to the hospital and "that was the time she said oh, he is just drunk." (*Id.,* p. 7) Kynard described Waters' actions as lying down and then getting up every few minutes, and then later he started vomiting, having diarrhea, getting under the covers because he was cold but then getting hot. He also heard Waters holler and beg for help. (*Id.,* p. 2-3).

At one point, Collins told Kynard that he "need[ed] to stop hitting the buzzer because wasn't nobody fixing to go to the doctor." (*Id.,* p. 7) Kynard testified that shortly before Collins left at 4:00 p.m., she came back to the cell. (*Id.*) Waters was still "hollering and begging" and Collins said that Waters was drunk and "she should have told sheriff before she left" or "before he left." (*Id.*) Kynard believes that Collins "said I don't care if he die." (*Id.,* p. 7) He could not count the number of times he saw Collins "because she was in and out the door, walking up the hallway, walking back to the thing where they be in sitting watching the camera. . . She do that every day." (*Id.*, p. 5)

Collins testified that she did not talk to Waters on June 21st, until she "got ready to leave" at "about ten minutes till four when [she] came out, out of the control room" and "he came to the door." (Doc. 148-4, p. 9) She testified that Waters "walked to the door and asked

[her] for two Ibuprofen. (Doc. 148-4, p. 13)[9] Collins testified that the jailers have discretion to determine the seriousness of an inmate's illness and decide whether to call an ambulance or have the inmate fill out the form to ask to see a doctor. Also, jailers do not need to call the sheriff before an inmate can be taken out of the jail for medical care. (*Id.* p. 5-6) When asked her opinion whether Waters was drunk the day he died, Collins answered: "I didn't observe it." (*Id.*, p. 14)

Inmate Lester Jeffries saw Waters when he was first moved to general population at about 11:30 a.m. (Doc. 148-19, p. 2, 19). On questioning, he could not recall the time frame very well but did remember that Sanders gave Waters Ibuprofen soon after he came to the cell. (Id.) He also remembered that Waters was asking Collins to help him. (*Id.*, p. 17) He testified that Collins "put" Waters' condition "on the alcohol" but "then that worried her so much that she said she was going to call Sheriff Hood." (Doc. 159-18, p. 6) Jeffries did not know for certain whether Waters called Hood but "when she came back, she said - - exactly . . . "Sheriff Hood said, well, ain't no doctor coming here tonight, . . . you will see a doctor tomorrow." (*Id.*, p. 6) Jeffries testimony was largely the same as Kynard and Williams as to Waters' complaints and symptoms even though he had difficulty recalling the time frame. (*Id.*, p. 2, 19)

After 4:00 p.m., the shift changed and jailers Isaac Eubanks and Mary Bennett were on duty. (*Id.*, p. 5; Doc. 159-20, p. 2) When Bennett arrived, Tutt called the control room and told her that Waters was sick, and she and Eubanks went into Waters' cell. (Doc. 159-7, p. 29; Doc. 159-20, p. 2) Bennett went to the cell and Waters told her that he could not breathe, that his

---

[9] The testimony is unclear as to when Waters was given another dose of Ibuprofen. His medication log indicates that "B.S." gave him two 200 m.g. Ibuprofen at 11:15 a.m. and at 6:00 p.m. (Doc. 159-25). This is inconsistent with Bobby Sanders' shift ending at 4:00 p.m. but somewhat consistent with Kynard's testimony that Sanders gave Waters another dose of Ibuprofen, after the initial dose at 11:15 a.m.

chest and back hurt, and that he needed to go to the doctor.  (Doc. 159-20, p. 2)  She gave him a Stanback before she called Hood. (*Id.*)  Not "too long afterward", Waters started throwing up, having diarrhea, having hot flashes, and sweating. (*Id.*, p. 3-4)  Bennett saw Waters try to get to the toilet and he was "dragging, just holding his back." (*Id.*, p. 4)  She gave Waters some Pepto-Bismol and a Sprite. (*Id.*, 3-4).

Bennett and Eubanks went back to the control room but the inmates kept buzzing.  They checked on Waters again and then Bennett called Hood about thirty minutes after she had given Waters the Pepto-Bismol and Sprite.  (*Id.*, p. 4)  Bennett could not recall the exact time she spoke with Hood but she told him that Waters was "throwing up and using the bathroom", "couldn't hardly breathe" or "shortness of breath" and that "something going on with his back". (*Id.*, p. 5) Hood told her to let Waters fill out a form and they would take him to the doctor in the morning. (*Id.*, p. 6)  Tutt believed that Bennett called Hood around 5:30 or 6:00 p.m.[10]  (Doc. 159-7, p. 10) Bennett and Eubanks went back to talk with Waters about completing the form but he was worse.[11] (Doc. 159-10. p. 6, 12)  Eubanks called Hood and he said again for Waters to fill out the form to see a doctor. (*Id.*, p. 10)  Shortly thereafter Waters died.  Bennett, Tutt, Kynard, Williams and another inmate Christopher Collins were in the cell when Waters died.  Bennett

---

[10] Inmate Williams did not hear Bennett or Eubanks call Hood but "they came out and they told them that they had called Sheriff Hood and he said he wasn't going to take [Waters] to the doctor until tomorrow." (Doc. 159-15, p. 4)

[11] Tutt's testimony as to the time frame for Waters' condition is relatively the same as Bennett's. He testified that Waters consistently worsened from the time he entered the cell. He recalled that Waters had stripped out of his inmate suit because he was hot and Tutt placed the onset of diarrhea and vomiting around 4:30 to 5:00. (Doc. 159-7, p. 9-10, 29)  After 5:00 p.m., Bennett came in and sent Tutt to get the Stanback or Goody powders for Waters. (*Id.*)  All the while, Tutt heard Waters tell them he was cold, could hardly breath, his back hurt, was about to die, and needed a doctor. (*Id.,* p. 11-12) Tutt places Bennett and Eubanks back in the cell about 6:00 p.m. and believed that they called Hood again around 7:00 p.m. (*Id.,* p. 11).

and Eubanks called Hood and told him that Waters had died and Hood told them to call an ambulance and the coroner.  (*Id.*, p. 6, 10)

Hood recalls getting two phone calls about Waters.  (Doc. 159-1, p. 18)  He testified that Eubanks did not tell him that Waters was having shortness of breath and "that would've been reason to send them or call the ambulance. . ." (*Id.*)  Hood testified that "if somebody complain about breathing problem, chest pain, stuff like that, you know, you consider that as more serious than somebody with a runny nose." (*Id.*, p. 16)   Hood also testified that on June 21, the day Waters' died, the only conversation he had with Collins was when he asked her how Waters was doing and she said that he seemed to be okay during her shift up to the time she left. (Doc. 159-1, p. 18)

IV. <u>Analysis</u>

a. <u>Defendants' Motion to Strike the Expert Opinion of Dr. Michael Gelfand</u>

The parties do not dispute that this action involves complex medical issues such that medical expert testimony is necessary in order for Sawyer to prove that defendants' actions were the proximate cause of Water' death.  *See Wingster v. Head*, 318 Fed. Appx. 809, 815-816 (11th Cir. 2009) [12] ("We recognize that Wingster relies on the temporal proximity of the alleged beatings on October 14 and the aneurysm on October 16. However, this medical causation issue presents a technical and scientific issue that requires the specialized knowledge of an expert medical witness.") (citing Fed. R. Evid. 701, 702); *Estate of Gilliam ex rel. Waldroup v. City of Prattville,* 639 F.3d 1041, 1044-1045 n.4 (11th Cir. 2011) (finding that the "state law wrongful death claims under Ala. Code § 6–5–410, and the § 1983 excessive force claims alleging that

---

[12] Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority. Rule 36-2 of the United States Court of Appeal for the Eleventh Circuit.

death was the result of the use of force, were both dismissed at the summary judgment stage because the Estate produced no admissible evidence that the officers' use of force caused the decedent's death" and noting that the district court excluded both of the Estate's medical experts on causation); *Carr v. Marshall County Sheriff's Office*, 2013 WL 1834471, *4 (N.D. Ala. Apr. 30, 2013) (finding that plaintiff's § 1983 wrongful death claim failed because plaintiff did not offer "any expert medical testimony to support causation.").

In this action, Sawyer offers the medical expert opinion of Dr. Michael Gelfand as to causation.[13] Dr. Gelfand identified the legal, medical, and investigatory documents and photographs he reviewed, and stated as follows:

> It is my opinion that if medical care had been provided to Mr. Waters in the setting of an acute care hospital or an emergency room on June 20, 2011 or in the morning of June 21, 2011 up to approximately noon, he, more likely than not, would not have died from untreated pulmonary tuberculosis. Stated differently, it is my opinion to a reasonable degree of medical probability that Mr. Waters would have survived if he would have been given access to appropriate medical care in a timely manner.

(Doc. 147-8, p. 4)

Dr. Gelfand found that Waters died after a short illness and that his "post-mortem examination showed extensive bilateral pulmonary tuberculosis." (*Id.*) He also stated that "sudden death secondary to pulmonary tuberculosis is described in the medical literature" and that "[p]ossible mechanisms of death secondary to pulmonary tuberculosis include: A. Hypoxemia B. Electrolyte disturbances and/or acidosis C. Bacterial super-infection [and] D.

---

[13]Defendants do not challenge Dr. Gelfand's status as a medical expert in infectious diseases and internal medicine. Dr. Gelfand is a Professor of Medicine at the University of Tennessee Health Science Center in Memphis, Tennessee and practices as an infectious disease specialist. He is a diplomat of the National Board of Medical Examiners, American Board of Internal Medicine, and the American Board of Infectious Diseases. He has 33 years of experience and practice of Infectious Disease and Internal Medicine and has published extensively. (Doc. 147-8, Expert Report and Curriculum Vitae)

Adrenal insufficiency." (*Id*.)  Dr. Gelfand concluded that "[a]ll of the above disturbances could have been adequately diagnosed and treated in the period of 8 hours (noon to the time of death), thus it is my opinion that the patient would have more likely than not survived, if examined and treated by a medical professional prior to noon of June 21, 2011." (*Id*.)

Defendants argue that Sawyer cannot meet her burden to prove at trial that the defendants' actions caused Waters' death because Dr. Gelfand's opinion is unreliable and does not meet the requirements of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).  In *Kilpatrick v. Breg, Inc*., 613 F.3d 1329, 1335 (11th Cir. 2010), the Court of Appeals for the Eleventh Circuit explained the standard set forth in *Daubert,* as follows:

> *Daubert* requires that trial courts act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach the jury. 509 U.S. at 597, n. 13, 113 S.Ct. 2786, 125 L.Ed.2d 469. The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." [*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)].
>
> Federal Rule of Evidence 702 governs the admission of expert testimony in federal court, and provides that:
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Applying these principles, this Court has previously held that expert testimony may be admitted if three requirements are met. First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by a *Daubert* inquiry. Third, the testimony must assist the trier of fact through the application of expertise to

understand the evidence or determine a fact in issue. *Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir.1998).

*Kilpatrick*, 613 F.3d at 1335.

When reliability is at issue, the Eleventh Circuit instructs as follows:

[i]n deciding the question of reliability, the Supreme Court articulated a non-exhaustive list of relevant factors to consider: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S. Ct. 2786, 125 L.Ed.2d 469; *McCorvey*, 298 F.3d at 1256. The court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593–94, 113 S. Ct. 2786, 125 L.Ed.2d 469.

*Kilpatrick*, 613 F.3d at 1335.

Defendants' challenge is based on the fourth prong – "whether the technique is generally accepted in the scientific community". They argue that Dr. Gelfand's opinion is unreliable because he did not base his opinion on "differential diagnosis" methodology, an accepted methodology or technique to ensure reliability. Defendants assert that because Dr. Gelfand identified tuberculosis and failed to identify any other possible cause of death such as emphysema, cardiovascular disease, a healed heart attack, atherosclerosis, chronic kidney disease, or nephrosclerosis as shown on the autopsy report, "by default he cannot eliminate any causes", and thus his opinion is not based upon a differential diagnosis. Defendants point out that Dr. Gelfand identified four mechanisms of death secondary to tuberculosis as the cause of death, but "estimated" without "precision" the time necessary to treat the four mechanisms, and that he had no idea which mechanism was actually present, or the severity, or the difficulty of treatment of that mechanism. Defendants also argue that Dr. Gelfand's opinion was unreliable because of

assumptions he made and because of potential breaks in the causal chain due to variables he did not consider.

"The 'differential diagnosis' methodology 'is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.'" *Kilpatrick,* 613 F.3d at 1336 n.7 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999)). "Although a reliable differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been the sole cause of the plaintiff's injury. ... [A]differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Guinn v. AstraZeneca Pharmaceuticals LP,* 602 F.3d 1245, 1253 (11th Cir. 2010). Also, "an expert must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause of the plaintiff's injury." *Id.*, at 1253 (internal quotation marks omitted; bracketed text in original).

Although not specifically outlined in his expert report, Dr. Gelfand's deposition testimony indicates that he considered and eliminated tuberculosis, emphysema, cardiovascular disease, a healed heart attack, atherosclerosis, chronic kidney disease, and nephrosclerosis as causes of death and ultimately determined that four possible mechanisms secondary to tuberculosis were plausible causes of Water's death- hypoxemia, electrolyte disturbances or acidosis, bacterial super-infection (pneumonia), and adrenal insufficiency. He began his testimony stating that the "most important complex of facts was the postmortem examination because it was entirely objective and provided evidence for the underlying diseases and the possible causes of death in a positive and a negative sense." (Doc. 159-5, p. 7)

Dr. Gelfand testified that Waters' autopsy showed that he had "emphysematous blebs, which likely suggested the presence of some degree of emphysema" a form of COPD, which would render him more vulnerable to hypoxemia. (*Id.*, p. 11-12) (*Id.*, p. 13, "Q. And did you look just at the tuberculosis, or did you look at any other condition he might have had? A. Such as? Q. Emphysema? . . . Q. Possibly COPD? A. [H]e walked in, so we know he was not disabled by his emphysema or COPD, and so it, as I mentioned would make him more vulnerable to the effect of tuberculosis, but again it's treatable.")

Dr. Gelfand testified that Waters' heart disease was mild and that his heart was not severely impaired or dilated. (*Id.*, p. 20, "A. What we know about his heart is described in the postmortem evaluation. The heart size was normal . . . He had [a] mild degree of coronary artery disease, 20 percent, which is not medically important. He had one and a half centimeter, a little bit more than half an inch, in diameter area of previous healed myocardial infarction which would not have had an effect on the heart function. It was not a normal heart, but I don't believe it was a bad heart or a severely impaired heart or dilated heart.") (*Id.*, p. 14, "A. In a theoretical patient with a bad heart, you can still treat tuberculosis successfully, if the cardiac function is adequate, if the heart is not dilated, the patient will take medicines and tuberculosis will be successfully cured.").

Dr. Gelfand testified that the "pathological examination" of Waters' kidneys was "unremarkable". He explained that Waters' kidneys while showing "granular cortices," did not "appear to indicate any specific process such as tuberculosis". (*Id.,* p. 16)[14]   As to

_____

[14]Dr. Boudreau testified that the kidneys were "granular" and that Waters' had nephrosclerosis and chronic kidney disease. (Doc. 159-14, p. 3-4)

atherosclerosis, Dr. Gelfand testified that Waters' "aorta . . . had moderate changes of atherosclerosis[.]" (*Id.*, p. 20.)

Dr. Gelfand testified that he did not believe that the "tuberculosis was mechanistically killing [Waters] simply by being in his lungs. It was killing him via the mechanisms" enumerated in his report – hypoxemia, electrolyte disturbances or acidosis, bacterial super-infection (pneumonia) and adrenal insufficiency. *Id.*, p. 12-14.[15] Dr. Gelfand specifically "did not include pulmonary mechanisms of death such as hemorrhage or pneumothorax because they were not found on the postmortem exam." (*Id.*, p. 14) In sum, Dr. Gelfand testified

> In trying to determine what happened to him, we are limited in our scientific methods by the nature of available evidence because he was never subjected to medical evaluation, testing and treatment. If we had additional data, we would, I think, be able to be more precise. As it is, what information we have available are the general information on survivability of patients with tuberculosis . . . and then the information from postmortem examination which allowed me to rule out certain conditions such as bleeding out, a collapsed lung, or disseminated disease elsewhere in the body or underlying cancer and limited them to plausible ways in which tuberculosis of the lungs can kill you.

(Doc. 159-5, p. 22)

Dr. Gelfand concluded that any of those four mechanisms could have been successfully treated if Waters had received medical treatment as early as noon on June 21, 2011, approximately eight hours before his death.

Defendants assert that Dr. Gelfand simply guessed at the time frame. When asked the significance of the eight-hour period of time in his report, Dr. Gelfand testified as follows:

> A. This was a period that I estimated it would take liberally to determine the nature of the disturbances that I enumerated and to manage them in an average emergency room or hospital. There is no precision to that determination. Some of

---

[15] ". . . I was looking for possibilities of other mechanisms of death such as disseminated tuberculosis involving other organs or the bleeding out from a cavity, and this was not described on postmortem examination." (Doc. 159-5, p. 15)

them can be managed much more rapidly as we discussed earlier in the deposition, such as administration of oxygen for hypoxemia or IV fluids for hypotension; others may take longer to take effect, such as antibiotics for bacterial infection or hydrocortisone. So I came up with that number, it sounded about right. It could be 7 hours and 45 minutes or 8 hours and 15 minutes or 9 hours, but that's what I came up with.

Q. And again this was just you picked a number or –

A. That's correct. It probably may have resonated in my mind from the studies of how long it takes for the antibiotics to have an effect on the survival in bacterial pneumonia. Some of the guidelines for bacterial pneumonia recommend that the patient be treated within that period of time.

Q. So based on the medical research regarding the time for the treatment of bacterial pneumonia?

A. That was one of the considerations. Others have already been discussed by me, and that is the time that it would take to determine the nature of the abnormalities and to treat them effectively.

Q. So for the four different possible mechanisms of death, it could take 8 hours to treat either one, would that be what you're saying?

A. I don't know if I can reconcile "four" and "either one," so you might want to explain that.

Q. Well -- okay. Well, you mentioned –

A. You mean any of the four?

Q. Yes. As far as how long it would take, because you mentioned 8 hours.

A. If I was opposing counsel, I would object on the grounds that it's been asked and answered, but I'm not an attorney so I will say it again. It may take a shorter interval for hypoxemia or hypotension, it may take a bit longer for bacterial infection or adrenal insufficiency. It would depend on what is found when the patient is evaluated when he rolls into the emergency room.

(Doc. 159-5, p. 15)

Q. Now, do you recall the names of any literature or articles that you read regarding where you came up with the 8 hours?
. . .

A. This was an estimate based on common sense and how long in my experience it would take for the emergency room or hospital to check vital signs, to administer oxygen, to draw blood, to get it to the lab and test it, that kind of stuff. But the basic argument that I developed and presented to you is that when the patient is sent to the emergency room, the normal patterns of evaluation and care would encompass the problems he likely suffered from and likely was the mechanism of death or mechanisms of death and would have managed within that interval resulting in, more likely than not, survival or control of this disease.

(*Id.*)

Dr. Gelfand's testimony does not indicate that he simply "picked a number" even though he answered that question affirmatively. He then qualified the answer by explaining that the time period was based upon studies regarding time for treatment of bacterial pneumonia and "the time it would take to determine the nature of the abnormalities and to treat them effectively" as Dr. Gelfand had previously testified. (Doc. 159-5, p. 12-13, testimony regarding the amount of time to diagnose and treat hypoxemia, electrolyte disturbances and/or acidosis, bacterial super-infection, adrenal insufficiency) Dr. Gelfand also based his opinion in part on his own experience as a physician. "The text of Rule 702 dictates that expert status may be based on *experience,* and the Advisory Committee Notes dictate that experience alone 'may ... provide a sufficient foundation for expert testimony.'" *United States v. Frazier*, 387 F.3d 1244, 1295 (11th Cir. 2004) (italics in original) (citing Rule 702 cmt. at 290) "After all, '[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from ... specialized experience"' and 'no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'" *Id.* at 1298 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 1174, 1178 (1999)). Defendants may challenge Dr. Gelfand's opinion on cross-examination or through the

testimony of their expert witnesses.[16]  "[V]igorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

Accordingly, the motion to strike is DENIED.

 b. Sawyer's § 1983 claim

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

 The Eleventh Circuit has held that Alabama's survivorship law, Ala. Code § 6-5-462,

applies to § 1983 actions.  *See Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d

1041 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 817 (2011).  "Under that provision, 'a deceased's

unfiled tort claims do not survive the death of the putative plaintiff.' " *Id.* at 1046 (quoting

---

[16] Defendants' medical expert John Moorehouse, MD, who is board certified in Emergency
Medicine, testified that the four mechanisms would have been identified and treated in an
emergency room within the eight-hour period but total correction and reversal would depend on
the severity. (Doc. 159-11, p. 6, 14)  He opined that "to a reasonable degree of medical certainty
that the factors in this case made survivability unlikely." (Doc. 159-2, p. 3)  Defendants'
medical expert William P. Saliski, D.O., a pulmonary and critical care physician, testified that
hypoxemia and electrolyte disturbances could be treated within an hour at an emergency room
but bacterial super-infection would take 24 to 72 hours to diagnose from cultures and adrenal
insufficiency was a complicated diagnosis and could take days to weeks. (Doc. 159-12, p. 6, 9-
10)  He opined that as to the "timeliness of medical intervention, unfortunately, statistically,
sudden death 'in the field or out of the hospital' has no increased survivability over sudden death
in the hospital environment." (Doc. 147-5, p. 3)  Both Drs. Moorehouse and Saliski opined that
Waters died from his cardiac disease. ("As it appears, Mr. Waters had sudden death having a
ventricular arrhythmia would cause his left heart to dysfunction thus causing pulmonary edema
which would be consistent with what was found in the patient's lungs." (*sic*) (Dr. Saliski, Doc.
147-5, p. 3); ("It is more likely that he developed a cardiac dysrhythmia and subsequent
pulmonary edema and had contributory tuberculosis, chronic alcoholism, and COPD - - this, all
together, making his survivability unlikely." (Dr. Moorehouse, Doc. 159-2, p. 3)

*Bassie v. Obstetrics & Gynecology Assocs. of Northwest Ala., P.C.,* 828 So. 2d 280, 282 (Ala. 2002)). However, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala. Code § 6–5–410." *Id.* at 1047.*Accord Kruse v. Corizon, Inc.,* 2013 WL 3366040, at *2-3 (S.D. Ala. July 5, 2013) (discussing *Estate of Gilliam*).

Sawyer bears the burden of proving that defendants' actions caused Waters' death. Since her medical expert witness has testified that Waters could have survived if he had obtained medical treatment before approximately noon on June 21, 2011, the parties appear to agree that as to causation, the inquiry is whether the actions taken by the defendants before that time resulted in Waters' death. As Sawyer points out, in the deliberate indifference analysis as to causation, the decision in *Gilliam* allows the Court to disregard the defendants' actions taken after that time, since those actions would not have caused Waters' death because he was "too far in his death spiral for it to matter." (Doc. 160, p. 39)

Sawyer alleges that defendants violated Waters' constitutional rights under the Eighth Amendment because they had subjective knowledge of his serious medical needs but disregarded the risk to Waters' health by failing to provide medical treatment and by unnecessarily delaying medical treatment. (Doc. 37, Count One) Sawyer alleges that defendants' conduct caused Waters' death from conditions that were curable had he received proper medical treatment. (*Id.*)

Defendants assert that they are entitled to qualified immunity as to Sawyer's § 1983 claim. The Eleventh Circuit has set forth the following the analysis for applying qualified immunity:

> "The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Case v.*

> *Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (internal quotation marks omitted). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ----, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). "[Q]ualified immunity is a privilege that provides 'an *immunity from suit* rather than a mere defense to liability.' " *Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)) . . .
>
> "To invoke qualified immunity, the official first must establish that he was acting within the scope of his discretionary authority" when the alleged violation occurred. *Id.* at 1325. "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "[T]he plaintiff must ... show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* "The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."*Pearson*, 129 S. Ct. at 818.

*Townsend v. Jefferson Cnty.,* 601 F.3d 1152, 1157-58 (11th Cir. 2010). " '[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.' " *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted)). "In order to overcome summary judgment because of qualified immunity, the facts in dispute must raise a genuine issue of fact material to the determination of the underlying issue." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (quotation omitted).

1. Whether defendants were acting within the scope of their discretionary authority?

In determining whether an official was "acting within the scope of his discretionary authority," the Court assesses whether the official's actions are "of a type that fell within the

employee's job responsibilities. [The Court's] inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). The record shows no dispute that defendants were government employees, *i.e.*, county employees and an elected official, acting within their discretionary authority at all times relevant. Their alleged acts or omissions fell within their respective job responsibilities. Therefore, the burden shifts to Sawyer to show that defendants are not entitled to qualified immunity. *Floyd v. Corder*, 426 Fed. Appx. 790, 791 (11th Cir. 2011) (citing *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004)).

2. Whether defendants violated Waters' clearly established constitutional rights?

Sawyer's § 1983 claim against defendants alleges that they were deliberately indifferent to Waters' serious medical need, resulting in his death. Sawyer relies on the evidence as set forth in the facts, *supra*, to establish that the defendants are not entitled to qualified immunity. Specifically, Sawyer alleges that before 11:14 a.m. on 6/21/11, Waters was struggling to breathe, could barely walk, and was begging to go to the doctor. (Facts I-A Doc. 161)(Doc. 160, p. 5-6) Moreover, all three defendants were told about Waters' symptoms by Waters and the other detainees/prisoners or in Hood's case, by Collins. From these facts, Sawyer argues that "prison officials need not diagnose the precise medical ailment . . . all that needs to be proven is that the inmate's condition 'is so obvious that even a lay person would easily recognize the necessity for a doctor's attention' and 'if left unattended, "pos[es] a substantial risk of serious harm."'" Sawyer also argues that "deliberate indifference may result not only from failure to provide medical care . . . but also from excessive delay" that exacerbates the medical condition.

"The Eighth Amendment prohibition on cruel and unusual punishments forbids prison officials from acting with a 'deliberate indifference to serious medical needs of prisoners.'" *Simmons v. Monserrate,* 489 Fed. Appx. 404, 405 (11th Cir. 2012) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). "[A] prison official's 'deliberate indifference to [the] serious medical needs of [a] prisoner[] constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment.' " *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. at 104). "To prevail on a deliberate indifference claim, the plaintiff must show that: (1) he had a serious medical need (the objective component), (2) the prison officials acted with deliberate indifference to his serious medical need (the subjective component), and (3) the injury was caused by the defendants' wrongful conduct." *Simmons,* 489 Fed. Appx. at 405-406 (citing *Goebert v. Lee Cnty*., 510 F.3d 1312, 1326 (11th Cir. 2007)).

A "serious medical need is one that has been diagnosed by a physician as mandating treatment[.]" *Kuhne v. Florida Dept. of Corrections,* - - - F. 3d  - - -, 2014 WL 503146, *4 (11th Cir. 2014 (slip copy) (quoting *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1307 (11th Cir. 2009)). There is no dispute of fact that Waters' did not have a diagnosed medical condition. Alternatively, a "serious medical need is . . . one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention" or, [i]n the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." *Kuhne,* 2014 WL 503146, at *4. "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" *Mann*, 588 F.3d at 1307 (citing *Farrow v. West*, 320 F. 3d 1235, 1243 (11th Cir. 2003)).

The parties debate whether Waters' condition was "so obvious" that defendants should

have recognized the need for treatment before approximately 11:00 a.m. on June 21, 2011.

However, since the undisputed evidence establishes that Waters' condition worsened over time

and ultimately he died, the Court finds Waters' serious medical condition posed a substantial risk

of serious harm if left unattended; the alternative test identified in *Mann*.[17] *See Weaver v. Toney*,

2012 WL 3597125, *4  (S.D. Ala. Aug. 1, 2012) ("The 'seriousness' of an inmate's medical

needs also may be decided by reference to the *effect* of delay in treatment. . . . [W]here the delay

results in an inmate's suffering 'a life-long handicap or permanent loss, the medical need is

considered serious.'") (citations omitted) (italics in original).

The subjective component requires that Sawyer must prove (1) the prison officials'

subjective knowledge of a risk of serious harm, (2) their "disregard of that risk, by [(3)] conduct

that is more than gross negligence." *Goebert*, 510 F.3d at 1326–27. "Whether a particular

defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to

demonstration in the usual ways, including inference from circumstantial evidence, and a

factfinder may conclude that a prison official knew of a substantial risk from the very fact that

the risk was obvious.' " *Goebert*, 510 F. 3d at 1327 (quoting *Farmer v. Brennan*, 511 U.S. 825,

842 (1994) (citation omitted)).  "Disregard of the risk is also a question of fact that can be shown

by standard methods." *Id*. (citing *Farmer*, 511 U.S. at 846).  *Accord Martinez v. Burns*, 459

Fed.Appx. 849, 851 (11th Cir. 2012) (per curiam) ("Whether a defendant has subjective

knowledge of the risk of serious harm and whether they disregarded that risk are questions of

fact that can be demonstrated in the usual ways, including inference from circumstantial

evidence.") (citing *Goebert*, 510 F.3d at 1327).

---

[17] The parties dispute the cause of death.  Sawyer's medical expert identifies causes secondary to tuberculosis, while defendants' experts opine that Waters had a sudden death event likely related to his coronary artery disease.  However, there is no dispute of fact that Waters' condition worsened during the course of the day on June 21, 2011.

"The meaning of 'more than gross negligence' is not self-evident but past decisions have developed the concept.  In cases that turn on the delay in providing medical care, [and] [w]here the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert,* 510 F. 3d at 1327.  Thus, "[t]he inadvertent or negligent failure to provide adequate medical care 'cannot be said to constitute "an unnecessary and wanton infliction of pain." ' " *Id.* (quoting *Estelle*, 429 U.S. at 105-06); *Mann*, 588 F.3d at 1308 ("While the deputies may have made an error in judgment, mere negligence or a mistake in judgment does not rise to the level of deliberate indifference. Plaintiffs' showing that harm resulted, without more, cannot carry the burden required for deliberate indifference.").

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm. Causation, of course, can be shown by personal participation in the constitutional violation." *Goebert*, 510 F.3d at 1327 (citing *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir.2003) and *Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir.1986) (per curiam)).

Hood in his individual capacity

Defendants as "the moving party" may support their "motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993) (quotation marks and internal citations omitted).  In response, Sawyer "must ... set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e).  Defendants have proffered evidence that during the relevant time period, Hood's personal involvement was limited to

observing Waters when he arrived on June 20, 2011, reaching the conclusion that Waters was intoxicated and seeing Waters walk from intake to general population on June 21, 2011 around 11:00 a.m. There is no evidence that Hood observed any of Waters' behavior after he was moved to the cell in general population.

Sawyer asserts that "Collins asked Hood minutes after [Waters] entered general population whether [Waters] could go to the hospital and Hood said 'no'." (Doc. 160, p. 9)  this allegation is based on the testimony of inmate Jeffries.(Doc. 160-1, p. 3)  Jeffries testified that he did not know for certain whether Collins called Hood but "when she came back, she said - - exactly . . . "Sheriff Hood said, well, ain't no doctor coming here tonight, . . . you will see a doctor tomorrow." (Doc. 159-18, p. 6)  Even assuming that Collins' statement, elicited from Jeffries, as to what Hood said is admissible hearsay, this is still insufficient to hold Hood accountable.  There is no evidence that Hood was informed of the specifics of Waters' condition during the relevant time period, *i.e.,* before or shortly after noon on June 21, 2011. Thus, there is not sufficient circumstantial evidence to support an inference that Hood had a subjective knowledge of the risk of serious harm to Waters if he did not see a doctor and that Hood disregarded that risk by conduct that is more than gross negligence. *Goebert*, 510 F.3d at 1326– 27.  Since the evidence is insufficient to establish that Hood violated Waters' constitutional rights, Sawyer has failed to meet her burden, and Hood is entitled to qualified immunity. Accordingly, summary judgment is due to be granted in favor of Hood.

Hood's Supervisory Liability

Defendants argue that Sawyer concedes any claims against Hood based upon supervisory liability by stating in a footnote that "Plaintiff does not oppose summary judgment on any theories of supervisory liability against Hood other than those based on his personal

involvement." (Doc. 160, p. 9, n.22) The law is "well-established that a Sheriff can have no *respondeat superior* liability for a section 1983 claim."*Weaver v. Mobile County,* 228 Fed. Appx. 883, 886 (11th Cir. 2007) (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir.2001). Hood may be found liable only if he "personally participated in the allegedly unconstitutional conduct or if there is 'a causal connection between [his] actions ... and the alleged constitutional deprivation.'" *Id*. (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003)).  If Hood did not personally participate in the allegedly wrongful conduct, then the causal connection can be established if there is a history of widespread abuse that puts Hood "on notice of the need to correct the alleged deprivation, and he fail[ed] to do so"; or Hood's "improper custom or policy le[d] to deliberate indifference to constitutional rights"; or the "facts support an inference that [Hood] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Hendrix v. Tucker,* 535 Fed. Appx. 803, 805 (11th Cir. 2013) (citations omitted).

In Count One, Sawyer alleged that Hood's policy or custom of not employing or having available a nurse or other medical personnel at the Perry County Jail, and Waters' death constituted deliberate indifference to the "risks posed by the serious medical conditions of the detainees/prisoners[.]" (Doc. 37, p. 8, Count One)  Also, in the statement of facts in the First Amended Complaint, Sawyer alleged that "Collins and Sanders were not trained nor instructed in the proper and acceptable methods of determining if a person is intoxicated or suffering from medical illness." (*Id*., p. 4, 8)  This allegation of failing to properly train the jailers[18] was

---

[18] Hood had a policy that allowed the jailers to call for emergency medical services if they believed an inmate had a medical emergency, without first calling Hood for approval.  Collins and Sanders knew this was the policy.  Bennett and Eubanks thought that they had to call Hood for approval before calling emergency services. (Doc. 148-1, Hood depo., p. 3-4; Doc. 148-3, Sanders depo., p. 7-8 ; Doc. 148-4, Collins depo., p. 4-5 ; Doc. 148-2, Bennett affidavit; Doc.

incorporated by reference into Count One. Since neither of these allegations are based upon Hood's personal involvement in the decisions regarding Waters' medical care, summary judgment is granted in favor of Hood as to these claims.

Defendants Collins and Sanders

The undisputed evidence as to Waters' condition before and at approximately noon on June 21, 2011, does not support an inference that Sanders and Collins had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that was more than gross negligence. Sanders and Collins arrived at work at 8:00 a.m. on June 21, 2011. Collins' contact with Waters was minimal before he was transferred to general population. She testified that she saw Waters on the monitor during the transfer and that Tutt was carrying Waters' mattress, but she did not observe anything unusual about Waters. Tutt, who had heard Waters' complaining of back pain earlier in the morning, did not tell Collins but at about 8:00 a.m. he told Sanders. Tutt told Sanders that Waters was "humped over and gasping for air and sweating and that he said he don't feel good", "barely breathing like he's weak", "complaining that his back was hurting" and "he wanted to be back in the back." (Doc. 148-11, p. 16-17) Sanders told Tutt that he would take Waters to the back after he took another inmate to the doctor. (*Id*., p. 17)

Anderson talked with Waters that morning and he told her that he was okay but he just wanted to be around somebody and wanted to go to general population. Later when Anderson

---

159-20, Bennett depo., p. 5, 12; Doc. 148-10, Eubanks affidavit). If an inmate is sick and wants to see a doctor, the inmate must fill out a medical request form, or the jailers can help the inmate fill out the form, and a medical appointment is scheduled. (Doc. 148-1, Hood depo., p. 3-4 ; Doc. 148-3, Sanders depo., p. 7-8 ; Doc. 148-4, Collins depo., p. 4-5) Bennett thought the inmate had to fill out the form: "We continued to tell Sheriff Hood that Mr. Waters was in such bad shape that he could not fill out the forms. Sheriff Hood listened to the requests and denied them. Because Arthur Waters had to fill a form and he was too weak to do that, I was unable to get him an ambulance or any medical treatment." (Doc. 148-2; Doc. 159-20, Bennett depo., p. 5, 12)

saw Waters walking to general population, she saw Tutt carry the mattress for Waters and observed that he was walking slow and holding his back. She heard Waters say that his back was hurting from sleeping on the hard bunk in intake.

The inmates who observed Waters on the walk to general population testified to significantly more symptomatology than did Sanders or Anderson. Tutt's testimony raises the strongest inference that Sanders could have been subjectively aware of Waters' serious medical needs since Tutt testified that during the walk, Waters said that he needed to see a doctor because he didn't feel good. He also said that Waters' was complaining that his back hurt really bad and he was short of breath, slumped over, and barely walking. Inmate Kynard's testimony that he started calling Collins on the intercom soon after Waters was placed in the cell with him because he thought Waters was sick and needed to see a doctor raises the strongest inference that Collins had subjective knowledge of Waters' serious medical needs at least as early as 11:30 a.m. However, the symptomatology that all observed at that time was that Waters was walking slow, humped over, complaining of back pain, and had difficulty breathing.[19] The severe diarrhea, nausea, vomiting, chills and fever occurred later in the afternoon. According to Sawyer's expert, in order to have survived, Waters would have needed treatment before approximately noon on June 21, 2011. Thus, the afternoon symptoms are not relevant to the determination of whether Collins and Sanders are entitled to qualified immunity.

Waters entered the jail without a diagnosed medical condition. Thus, while Waters was sick, his symptoms before noon on June 21, 2011 were not such that a reasonable inference could be drawn that Sanders and Collins had subjective knowledge of a risk of serious harm to Waters

---

[19] The difficulty breathing has been described as "gasping for air", "breathing bad", "short of breath," could "hardly breathe", and "barely breathing like he was weak".

and disregarded that risk <u>by conduct that was more than gross negligence</u>.[20] Since the evidence is insufficient to establish a constitutional violation, Sawyer has failed to meet her burden, and Sanders and Collins are entitled to qualified immunity. Accordingly, summary judgment is due to be granted in their favor.

<u>Sawyer's Count 2 for negligence under Alabama law</u>

The Court has determined that summary judgment is due to be granted as to Sawyer's federal claims, the only remaining claim in this action is Count 2 alleging "Alabama Common Law Negligence" for wrongful death. (Doc. 37, p. 8)  Sawyer has not pled a basis for original jurisdiction over this claim and none is apparent from the record.  Rather, the Court has exercised supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a).

However, § 1367(c)(3) states: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . ." This Court has previously declined to exercise its supplemental jurisdiction[21] and the Eleventh Circuit "ha[s] encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam).  *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a

---

[20] Cf. *Harper v. Lawrence County, Ala.*, 584 F.3d 1030, 1038 (11th Cir. 2009) (finding that plaintiff alleged sufficient facts to deny qualified immunity where defendants were told by other inmates that "several days after his initial incarceration Harper was hallucinating, slurring his words, physically weak, and incoherent", "displaying erratic and strange behavior", "acting strangely, losing his balance, and had urinated on himself.")

[21] *See, e.g., Mongham v. Soronen*, 2013 WL 705390, at *6 (S.D. Ala. Feb. 26, 2013) (DuBose, J.); *Bandy v. Midland Funding, LLC*, 2013 WL 210730, at *10 (S.D. Ala. Jan. 18, 2013) (DuBose, J.); *Kruse v. Byrne*, 2013 WL 6237694, at *17 (S.D. Ala. Dec. 3, 2013) (DuBose, J.).

surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims.' " (quoting *L.A. Draper & Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414, 428 (11th Cir. 1984) (citing *Gibbs,* 383 U.S. at 726))); *Dockens v. Dekalb Cnty. Sch. Sys.,* 441 Fed. Appx. 704, 709 (11th Cir. 2011) (per curiam) ("Once the district court properly granted summary judgment for the School System on the FMLA claims, no federal claims remained. It was not abuse of discretion for the court to decline supplemental jurisdiction over the state law claim.").[22]

Accordingly, the Court makes no ruling as to Sawyer's state law claim against defendants Collins and Sanders, as set out in Count 2 of the First Amended Complaint (Doc. 37), and instead finds that it is due to be **DISMISSED without prejudice**. *See, e.g., Ingram v. Sch. Bd.*

---

[22] Sawyer's remaining state law claim for wrongful death under Alabama law is subject to a two-year statute of limitation. Ala. Code § 6-5-410. The statute of limitation began to run on June 21, 2011, the date of Waters' death. *See* Ala. Code § 6-5-410(d) ("The action must be commenced within two years from and after the death of the testator or intestate."). This action was commenced on January 12, 2012 and the First Amended Complaint, which added Count 2 was filed on July 7, 2012. (Doc. 1; Doc. 37). However, § 1367(d) provides that "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." *See Roden v. Wright*, 611 So. 2d 333 (Ala. 1992) (finding that pursuant to 28 U.S.C. § 1367(d), Roden timely filed his suit in state court within thirty days of the order entering summary judgment on Roden's § 1983 claims in federal court); *Martinez v. City of Orlando,* 2009 WL 3048486, at *2 (M.D. Fla. Sept. 21, 2009) ("28 U.S.C. § 1367(d) provides that the statute of limitations is tolled while state law claims are pending in federal court until thirty daysafter an order of dismissal. Therefore, Plaintiff may pursue her state claims in state court if she so chooses, as long as she files in a timely manner."); *Lewis v. DeKalb Cnty. Bd. of Educ.,* 2013 WL 6073519, at *8 (N.D. Ala. Nov. 18, 2013); *Gainor v. Douglas Cnty., Ga.,* 59 F. Supp. 2d 1259, 1296 (N.D. Ga. 1998). Accordingly, dismissal of Sawyer's remaining state law claim will not prejudice her ability to timely re-file in state court.

*of Miami-Dade Cnty.,* 167 Fed. Appx. 107, 109 (11th Cir. 2006) (per curiam) ("When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court. *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999) ('If he decides to dismiss these state-law claims, then they should be dismissed without prejudice so that the claims may be refiled in the appropriate state court.')").

V. Conclusion

In accordance with the foregoing, defendants' motion to exclude is DENIED; defendants' motion for summary judgment is GRANTED as to Sawyer's claims pursuant to 42 U.S.C. § 1983 and Count One of the First Amended Complaint is dismissed with prejudice; and Sawyer's state law claims against defendants Collins and Sanders in Count 2 of the First Amended Complaint DISMISSED without prejudice.

Final judgment in accordance with this Order shall be entered by separate document.

**DONE** this the 24th day of February 2014.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE